# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Respondent/Plaintiff,

v.                                                CV 06-370 JB/WPL
                                                CR 03-569 JB

MARVIN THOMAS,

      Movant/Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

      This matter is before me on Marvin Thomas's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a person in federal custody. (Doc. 258)[1] Thomas was convicted of bank robbery and aiding and abetting, under 18 U.S.C. §§ 2113(a) and 2, and conspiracy to commit bank robbery under 18 U.S.C. § 371. For the following reasons, I recommend that the motion be denied.

## PROPOSED FINDINGS

### I.      Factual and Procedural Background

#### A.      Summary of Facts

      At approximately 2:40 in the afternoon on February 27, 2006, Omar Mohammed and Curtis Dwayne Frazier stole $29,415.40 from the Wyoming Boulevard branch of the Bank of America in Albuquerque, New Mexico. (Vol. I at 79, 97-98.) Mohammed and Frazier fled the scene of the robbery in a Gold Acura, which had been stolen four days before the robbery. (Vol. I at 39, 42, 162-

---

[1] All document number references are to CR No. 03-569.

63.)

On the day of the robbery, Thomas drove his girlfriend, Adrienne McCastle, to her school and babysat his two daughters. (Vol. 3 at 73-74.) After dropping McCastle at school, Thomas went to the their apartment at the Pinnacle View apartment complex, which they were in the process of vacating. (Vol. 1 at 246-47.) There, Thomas sold pieces of furniture and children's toys to other residents. (Vol. 1 at 246-47.) At 1:30 that afternoon, Thomas picked McCastle up from her school and drove McCastle, along with his two daughters, to McCastle's new apartment. (Vol. 3 at 77.) At approximately 2:00, Thomas returned to clean the couple's apartment at the Pinnacle View complex. (Vol. 3 at 77.)

Shortly after 2:00, Katherine Lambert, the Property Manager at the Pinnacle View Apartments, saw three individuals, two of whom wore clothing similar to that worn by Mohammed and Frazier during the bank robbery, enter the Pinnacle View complex in the Gold Acura. (Vol. 1 at 125-26, 196, 177-78, 203-04; Vol. 2 at 178.) Suspicious of the men, Lambert asked her maintenance workers to watch them and inform her of their destination. (Vol. 1 at 180.) The maintenance workers soon informed Lambert that the men had entered apartment 2013, the apartment Thomas and McCastle were in the process of vacating. (Vol. 1 at 180.) Approximately ten minutes after arriving, Thomas, along with the three men, left the apartment, got into a Red Ford Escape that Thomas had rented on February 24, and drove off. (Vol. 2 at 30-32.) Approximately ten minutes later, Thomas returned to the apartment unaccompanied by the three other men. (Vol. 2 at 33.) Ten minutes later Thomas again left the apartment in the Escape. (Vol. 2 at 33.)

Immediately after the bank robbery, Detective Real arrived at the Bank of America and began to investigate the potential escape routes the bank robbers were likely to have taken. (Vol. 2 at 53.)

The likeliest escape route led Real to the Vista Montana apartment complex, a building adjacent to the Pinnacle View apartments. (Vol. 2 at 59-62.) There, at 2:56 in the afternoon, Real spotted the Gold Acura and confirmed that its license plate matched that of the robbers' escape vehicle. (Vol. 2 at 46, 60-64.) Real informed the other detectives of his discovery. (Vol. 2 at 60-63.)

After learning that the Gold Acura had been located at a building adjacent to the Pinnacle View apartments, Detective Montano called Katherine Lambert and asked if she had seen a Gold Acura in the Pinnacle View parking lot prior to the time of the bank robbery.[2] (Vol. 2 at 174-78.) From Lambert, Montano learned that the Gold Acura had been at the Pinnacle View parking lot between approximately 2:20 and 2:30 and that the men who arrived in the car had visited Thomas's apartment. (Vol. 2 at 178-79.) After learning of the connection with the Pinnacle View apartment, Real, and Officer Wolf, set up surveillance of the area around Thomas's apartment. (Vol. 2 at 68-71.)

Approximately ten minutes after Mohammed and Frazier arrived at the Pinnacle View, both Detective Wolf and a maintenance worker at the Pinnacle View saw Thomas, Mohammed, Frazier, and Summers leave apartment 2013, enter the Escape, and begin driving toward the exit. (Vol. 2 at 72, 118, 180.) Detective Real, who sat in an unmarked police car parked in a fire-access "red zone," observed the four men in the car as they left the Pinnacle View parking lot. (Vol. 2 at 74.) Real made eye contact with Thomas, the driver. (Vol. 2 at 72.) At trial, Real described Thomas's reaction in the following way: "At this time, the driver stared at me for what seemed to be an eternity, and his - - he had kind of a strange look on his face, kind of slight-jawed, and just a - - just a surprised look." (Vol. 2 at 72-73.)

---

[2] A prior conversation with a colleague regarding an unrelated investigation prompted Montano's call to Lambert. (Vol. 2 at 176-78.) The substance of Montano's prior conversation was not admitted into evidence at trial. (Vol. 2 at 176-78.)

Real followed the Escape as it turned southbound on Pennsylvania Avenue. (Vol. 2 at 74.) After driving approximately a quarter mile, the Escape turned left and proceeded west on Comanche. (Vol. 2 at 76.) With Real following a short distance behind, the Escape made a U-Turn on Comanche and drove eastbound toward Pennsylvania. (Vol. 2 at 75-78, 122.) After the Escape made the U-Turn, Real, now driving in the opposite direction of the Escape, observed its occupants watch him as he passed. (Vol. 2 at 78.) At trial, Real stated that "[a]t this time, I tried to look as though I was not looking at the suspects in the vehicle, as it seemed that everyone in the vehicle was now looking at me to see what I was going to do or if I was following. That was the impression that I got." (Vol. 2 at 78.) The Escape then turned right and began driving southbound on Pennsylvania. (Vol. 2 at 80.) At this point, roughly five marked and unmarked police vehicles were following the Escape. (Vol. 2 at 80.) After entering Pennsylvania Avenue, where the speed limit is 30-35 miles per hour, the Escape accelerated to a speed of 50 miles per hour. (Vol. 2 at 122.) The Escape then turned onto McNerney, the first available right hand turn. (Vol. 2 at 82.) On McNerney, the Escape accelerated to a speed of roughly 50-55 miles per hour; the speed limit on McNerney is 25 miles per hour. (Vol. 2 at 124.) With several law enforcement vehicles in pursuit, the Escape reached an intersection and turned eastbound on Dellwood, at which point the car again accelerated to a speed of 50 miles per hour. (Vol. 2 at 82, 124.) As the Escape began to slow down and pull to the side of the road, the law enforcement vehicles conducted a felony stop. (Vol. 2 at 124.)

The police searched each occupant of the Escape. In Mohammed's front pocket the police felt a round object and asked Mohammed to identify this object. In response, Mohammed stated: "What do you think? It's bank money." (Vol. 2 at 130.) The objects turned out to be rolls of coins and 29 grams of crack cocaine. (Vol. 2 at 130; Vol. 3 at 13.) Later, Mohammed asked the officer

4

accompanying him to a police car: "How did you guys find us so fast?"[3] (Vol. 2 at 144.)

After arresting the four men, investigators from the Albuquerque Police Department and the Federal Bureau of Investigation found evidence connected to the bank robbery on Thomas's person, in the Escape, and in Thomas's apartment. In Thomas's pockets officers found $5,142.10 in cash, including ten "bait bills," which were later identified by the Bank of America. (Vol. 2 at 219, 265.) Additionally, inside the Escape investigators found a zipped bank bag containing cashier's checks and travelers checks, a purple pillowcase, containing cash and coins, that had been used in the bank robbery, a black ski mask similar to the one worn by Mohammed during the bank robbery, a black and white jacket, a pair of latex gloves, and a large amount of cash behind the passenger seat and in the cargo area. (Vol. 2 at 216-18, 229-40.) At Thomas's apartment, agents from the FBI also found several items connected to the bank robbery, including keys to the stolen Acura, white latex gloves turned inside out, clothing similar to that worn during the robbery, vault blocks from the Bank of America, paperwork from the bank, coin wrappers, and cash straps. (Vol. 2 at 210-12, 223, 228.)

### B.   Procedural History

Summers, Thomas, Mohammed, and Frazier were indicted for bank robbery and aiding and abetting bank robbery under 18 U.S.C. §§ 2 and 2113, and conspiracy to commit bank robbery in violation of 18 U.S.C. § 371. (Doc. 80.) On November 21, 2003, Frazier and Mohammed pled guilty to bank robbery and aiding and abetting. (Doc. 104; Doc. 106.) Thomas and Summers were convicted on both counts of the indictment. After his conviction, Thomas filed a motion for a new trial. (Doc.

---

[3] The Court of Appeals held that the admission at trial of Mohammed's statement "How did you guys find us so fast?" violated Thomas's Sixth Amendment right to confront witnesses called against him. *United States v. Summers*, 414 F.3d 1287, 1302-03 (10th Cir. 2005.) Because it was unconstitutional to introduce this statement at trial, I will not consider this statement in my analysis of the claims raised in Thomas's Motion under 28 U.S.C. § 2255.

228.) In his Motion for a New Trial, Thomas argued that the admission of Mohammed's testimonial hearsay statement violated his Sixth Amendment right to confront witnesses against him. (Doc. 228 at 1.) Thomas also argued that the governments' withholding of exculpatory evidence warranted a new trial. (Doc. 228 at 1.) The district court denied this motion and Thomas appealed. In a published opinion, the Tenth Circuit Court of Appeals held that although the admission of the testimonial hearsay statement violated Thomas's Sixth Amendment Right to confront witnesses against him, the introduction of this statement at trial was harmless error. (Doc. 255 at 29.) The Court of Appeals also held that the government's alleged withholding of exculpatory evidence did not merit a new trial because Thomas was unable to show that the evidence was favorable to his defense. (Doc. 255 at 35.) In the same decision, the Court of Appeals held that the evidence was insufficient to support the conviction of Gene Alan Summers, Thomas's co-defendant, and reversed Summers's conviction. (Doc. 255 at 15.)

## II.    Standard of Review

A petition under 28 U.S.C. § 2255 attacks the legality of a federal prisoner's detention. *Bradshaw v. Story*, 86 F.3d 164, 166 (10th Cir. 1996).  Under § 2255, a federal prisoner "may move the court which imposed the sentence to vacate, set aside or correct the sentence" if "the sentence was imposed in violation of the Constitution or laws of the United States, or . . . the court was without jurisdiction to impose such sentence, or . . . the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack . . . ."  28 U.S.C. § 2255.

Because Thomas is proceeding *pro se*, I will construe his pleadings liberally. *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991) (citing *Haines v. Kerner*, 404 U.S. 519 (1972)).  This broad reading of a *pro se* litigant's pleadings does not, however, relieve the *pro se*

litigant of the burden of alleging sufficient facts upon which a legal claim may be based. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). A court is not required to fashion a *pro se* litigant's arguments for him where his allegations are conclusory and lack supporting factual averments. *United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994) (citing *Hall*, 935 F.2d at 1110).

III.     **Discussion**

Thomas advances three arguments in support of his Motion. First, Thomas argues that trial counsel was constitutionally ineffective for failing to challenge, prior to trial, the sufficiency of the indictment. (Doc. 258 at 11.) According to Thomas, the indictment's failure to charge an offense under 18 U.S.C. § 2 rendered the indictment constitutionally defective. (Doc. 258 at 12.) Second, Thomas argues that appellate counsel was constitutionally ineffective for failing to challenge on direct appeal the sufficiency of the evidence to support Thomas's conviction for aiding and abetting bank robbery. (Doc. 258 at 17.) Similarly, Thomas's third argument posits that appellate counsel was constitutionally ineffective for failing to challenge on direct appeal the sufficiency of the evidence to support his conviction for conspiracy to commit bank robbery under 18 U.S.C. § 317. (Doc. 258 at 22.)

A.     **Sufficiency of the Indictment**

In his Motion, Thomas argues that "trial counsel was constitutionally ineffective for failing to challenge prior to trial the constitutionally defective indictment on the grounds that it failed to charge an offense under 18 U.S.C. § 2."[4] (Doc. 258 at 11.) To establish a claim for ineffective assistance of counsel, a habeas petitioner must satisfy a two-part test. First, the petitioner must show

---

[4] In his Motion, Thomas also states that the court did not "instruct the jury on 'aiding and abetting'" in his case. (Doc. 258 at 14.) The court's instructions to the jury, however, show Thomas's assertion to be incorrect. (Doc. 200.)

that counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  Judicial scrutiny of counsel's performance is highly deferential; the petitioner must overcome the presumption that the challenged action constitutes sound trial strategy.  *Id.* at 689.  Second, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 691. "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694. According to Thomas, the government's failure to "charge an essential element of the offense under § 2, i.e., § 2(a) . . . aids, abets, counsel, commands, induces or procures . . . or § 2(b) willfully causes . . ." constituted a jurisdictional defect that trial counsel should have challenged prior to trial. (Doc. 258 at 12.) Trial counsel's failure to challenge this jurisdictional defect prior to trial constituted, according to Thomas, constitutionally ineffective assistance of counsel.

"An indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense." *United States v. Dashney*, 117 F.3d 1197, 1205 (10th Cir. 1997). Where, however, the defendant is charged with aiding and abetting under 18 U.S.C. § 2, the indictment need not specifically charge the defendant as an aider and abettor. *See United States v. Pickens*, 465 F.2d 884, 885 (10th Cir. 1972) ("Under proper circumstances an instruction on aiding or abetting may be given in cases where the indictment does not allege a violation of the aiding and abetting statute . . . ."); *Brinlee v. Crisp*, 608 F.2d 839, 853 (10th Cir. 1979) ("The federal courts instruct in proper cases on aiding and abetting, even though the indictment does not allege violation of aiding and abetting statute."). Rather, "a defendant can be convicted as an aider and abettor even though he was indicted as a principal for commission of the underlying offense and not as an aider

and abettor, providing that commission of the underlying offense is also proven." *United States v. Cooper*, 375 F.3d 1041, 1049 (10th Cir. 2004) (citing *United States v. Scroger*, 98 F.3d 1256, 1262 (10th Cir. 1997)). Thus, an indictment is not defective merely because it fails to specifically charge the defendant with aiding and abetting. Accordingly, trial counsel's failure to challenge the sufficiency of an indictment for not alleging the elements of aiding and abetting does not constitute ineffective assistance of counsel.

       B.     **Sufficiency of the Evidence**

     In the second and third claims of his Motion, Thomas argues that appellate counsel was constitutionally ineffective for failing to raise on direct appeal that the evidence presented at trial was insufficient to support both Thomas's conviction for aiding and abetting bank robbery and for conspiracy to commit bank robbery. Thomas's ineffective assistance of counsel claim is governed by the standard set forth in *Strickland. See Sherrill v. Hargett*, 184 F.3d 1172, 1175 (10th Cir. 1992). Thus, Thomas must establish that appellate counsel's performance fell below an objective standard of reasonableness and that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-89, 694.

     "When a habeas petitioner alleges his counsel was ineffective for failing to raise an issue on appeal, [the Court] examine[s] the merits of the omitted issue." *Banks v. Reynolds*, 54 F.3d 1508, 1515 (10th Cir. 1995). "Failure to raise an issue that is without merit 'does not constitute constitutionally ineffective assistance of counsel because the Sixth Amendment does not require an attorney to raise every nonfrivolous issue on appeal.'" *Id.* (quoting *United States v. Dixon*, 1 F.3d 1080, 1083 (10th Cir. 1993). "Thus, counsel frequently will 'winnow out' weaker claims in order to focus effectively on those more likely to prevail." *Id.* (citing *Smith v. Murray*, 477 U.S. 527, 536

(1986)).

On appeal, Thomas's counsel raised two arguments. First, counsel argued that the government's introduction of Mohammed's statement "How did you find us so fast" violated Thomas's Sixth Amendment right to confront his accuser. Second, counsel argued that the district court erred in not granting Thomas a new trial after the government failed to disclose exculpatory evidence. In his Motion, Thomas argues that in addition to these to claims on appeal, his appellate counsel should also have challenged the sufficiency of the evidence supporting both his conviction for aiding and abetting under 18 U.S.C. § 2 and his conviction for conspiracy under 18 U.S.C. § 371.

In a challenge to the sufficiency of the evidence, "[the court] examine[s] the evidence in the light most favorable to the government in order to determine whether the evidence, both direct and circumstantial, together with all reasonable inferences to be drawn therefrom, is substantial enough to establish guilt beyond a reasonable doubt." *United States v. Kendall*, 766 F.2d 1426, 1431 (10th Cir. 1985). "[W]hile the evidence supporting the conviction must be 'substantial' and 'do more than raise a mere suspicion of guilt,' it 'need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt'" *United States v. Johnson*, 42 F.3d 1312, 1319 (10th Cir. 1994) (citing *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir. 1987) and *United States v. Alonso*, 790 F.2d 1489, 1493 (10th Cir. 1986)). A court will not "overturn a jury's finding unless no reasonable juror could have reached the disputed verdict." *United States v. Carter*, 130 F.3d 1432, 1439 (10th Cir. 1997). Rather, a court must "affirm the judgment of conviction if there is record evidence which would allow a rational trier of fact to find the defendant guilty of the crime charged in the indictment beyond a reasonable doubt." *United States v. Young*, 862 F.2d 815, 818 (10th Cir. 1988). When viewed in its entirety, however, the evidence "'must generate more than a

mere suspicion of guilt, and where such evidence is equally consistent with both guilt and innocence the conviction cannot be sustained.'" *United States v. Weidner*, 437 F.3d 1023, 1032 (10th Cir. 2006) (quoting *United States v. Fox*, 902 F.2d 1508, 1513-14 (10th Cir. 1990)).

For the reasons discussed below, I conclude that appellate counsel's performance did not constitute ineffective assistance of counsel. Thomas argues that appellate counsel should have challenged the sufficiency of the evidence supporting his convictions for aiding and abetting and conspiracy to commit bank robbery. I conclude, however, that these arguments lack merit and that appellate counsel "winnow[ed] out weaker claims in order to focus effectively on those more likely to prevail." *Banks*, 54 F.3d at 1515 (internal citation omitted).[5] Accordingly, appellate counsel's failure to raise these issues did not constitute ineffective assistance of counsel.

1.  **Sufficiency of Evidence at Trial to Convict Thomas of Aiding and Abetting Bank Robbery**

In support of his Motion, Thomas argues that insufficient evidence exists to support the jury's conclusion that he aided and abetted Mohammed and Frazier in committing the bank robbery. Thomas argues that his conviction rests on several impermissible inferences drawn by the jury from the facts presented at trial. According to Thomas, the "gap" between these facts and the jury's

---

[5] On appeal, Thomas's counsel focused the Court of Appeals' attention on the district court's admission of Mohammed's testimonial hearsay statement. The Court of Appeals held that the admission of this statement violated Thomas's Sixth Amendment right to confront witnesses against him. The burden then fell to the government to show that the constitutional violation was harmless error. *See United States v. Summers*, 414 F.3d 1287, 1303 (10th Cir. 2005) ("Under a harmless error analysis, the government bears the burden of demonstrating that the error was harmless beyond a reasonable doubt."). In contrast to harmless error review, where the burden is on the government, pursuit of a sufficiency of the evidence claim requires the appellant to show that the evidence, when viewed in a light most favorable to the government, fails to support the appellant's conviction. Accordingly, counsel's decision to pursue an appeal of a constitutional violation subject to harmless error analysis instead of a sufficiency of the evidence claim does not fall below an objective standard of reasonableness.

ultimate conclusion is too wide to support his conviction for aiding and abetting. Specifically, Thomas contends that from the evidence established at trial, a reasonable jury could not infer that he had an intent to "further the criminal venture," a necessary element in an aiding and abetting analysis. Thomas's argument, however, fails to persuade me that the government lacked sufficient evidence to support his conviction of aiding and abetting the bank robbery. Rather, the government established sufficient evidence at trial from which a reasonable jury could infer that Thomas's actions satisfied the conditions necessary to support a conviction for aiding and abetting.

To obtain a conviction for aiding and abetting under 18 U.S.C. § 2, the government must prove, beyond a reasonable doubt: (1) that the underlying offense was committed by some person; (2) that the defendant associated with the criminal venture; (3) that the defendant purposefully participated in the criminal venture; and (4) that the defendant sought by his actions to make the venture successful. *See United States v. Williamson*, 53 F.3d 1500, 1515 (10th Cir. 1995). As part of this burden, the government must "demonstrate the defendant 'willfully associated [] with the criminal venture and sought to make it succeed through some action on [his] part.'" *Id.* (quoting *U.S. v. Hanson*, 41 F.3d 580, 582-83 (10th Cir. 1994)). "[T]o be guilty of aiding and abetting a crime, one does not have to have an active stake in the outcome of the crime," but must merely participate in the crime. *United States v. Uresti-Hernandez*, 968 F.2d 1042, 1045 (10th Cir. 1992). The government presented sufficient evidence from which a jury could infer that Thomas associated with, and purposefully participated in, the criminal venture and sought by his actions to make it successful.

To establish that an individual willfully associated with the criminal venture, the government must show that the "defendant 'share[d] in the intent to commit the underlying offense'" and had "requisite knowledge of illegal activity." *United States v. Vallejos*, 421 F.3d 1119, 1123 (10th Cir.

2004); *Williamson*, 53 F.3d at 1516. Several facts presented at trial establish sufficient evidence from which a jury could reasonably infer that Thomas had knowledge of the bank robbery and shared the criminal intent to commit bank robbery. After the defendant's arrest, investigators found evidence associated with the bank robbery both in Thomas's apartment and in the Escape. Specifically, after obtaining a warrant to search apartment 2013, FBI agents discovered clothes worn during the bank robbery, white latex gloves turned inside out, and non-monetary items from the bank, including vault blocks, coin wrappers, paperwork, and cash straps. Additionally, in the Escape, investigators found a bank bag, the purple pillowcase used in the robbery, a pair of latex gloves, and a large amount of cash behind the passenger seat and in the cargo area. A jury could reasonably infer from the presence of such evidence in his apartment and the Escape, combined with Thomas's driving behavior and the discovery of over $5,000 in cash on his person, that Thomas had knowledge of the crime and shared the criminal intent of the principals. *See United States v. Williamson*, 53 F.3d 1500, 1515-16 (10th Cir. 1995) (concluding that the defendant's presence at a crime scene and action of counting the money involved in the drug transaction after witnessing the money exchange hands was sufficient evidence from which a jury could conclude that the defendant had the requisite knowledge of criminal activity to support a conviction for aiding and abetting).

Similarly, the government presented sufficient facts at trial from which the jury could reasonably conclude that Thomas purposefully participated in the criminal venture and sought by his actions to make the criminal venture succeed. An employee of the Pinnacle View apartments testified that he saw Thomas leave the apartment building with three individuals approximately forty minutes before the bank robbery. From the evidence presented at trial, a reasonable jury could infer that Mohammed and Frazier were two of these individuals. Following the bank robbery, Mohammed and

13

Frazier abandoned the Acura at the Montana Vista apartments and immediately went to Thomas's apartment. Additionally, Thomas's action of driving from the apartment, making a sudden U-Turn, and increasing his speed to almost double that of the posted speed limit present facts from which a jury could infer that Thomas participated in the venture and sought to make it succeed. *See Uresti-Hernandez*, 968 F.2d at 1045 (holding that defendant's action of dropping illegal aliens at a border checkpoint and then driving through the checkpoint and retrieving the individuals on the other side provided sufficient evidence for a jury to infer that the defendant participated in the crime charged).

Thomas is correct that an individual's "presence at a crime scene is insufficient to prove aiding and abetting." (Doc. 258 at 20.) A reasonable jury, however, could infer from the facts presented at trial that Thomas's presence at the apartment and in the Escape satisfies the elements required to establish criminal liability for aiding and abetting. *United States v. Starnes*, 109 F.3d 648, 650 (10th Cir. 1997) (recognizing that although presence at a crime scene is not enough to support a conviction, the "existence of a large amount of cocaine in [defendant's] bedroom" was probative of defendant's guilt); *See Williamson*, 53 F.3d at 1515 ("[W]hile [defendant's] presence, standing alone, cannot support a conviction for aiding and abetting, it is certainly probative evidence that the jury may consider in determining whether [defendant] was guilty of the offense charged.").

Sufficient evidence exists from which a jury could infer that Thomas had knowledge of the crime, that he purposefully participated in the crime and that he intended, by his actions, to further the criminal venture. The evidence presented at trial, though circumstantial, indicated that Thomas associated with Mohammed and Frazier both before and after the bank robbery. He then provided transportation for Mohammed and Frazier after they robbed the bank and abandoned the stolen Acura. Evidence acquired after the defendants' arrest establishes that activity connected with the

14

robbery occurred while the four men were within Thomas's apartment. While driving, Thomas appeared surprised to see a police officer, made a U-Turn shortly after leaving the Pinnacle View apartments, and drove significantly in excess of the posted speed limit while being followed by members of the Albuquerque Police Department. Finally, investigators found evidence connected with the bank robbery in Thomas's apartment, in the Escape, and, in the form of $5,142.10, on his person. *See Starnes*, 109 F.3d at 649 (dismissing defendant's attempt to use a "divide and conquer" approach to undermining the evidence and insisting instead that "[i]t is the totality of the evidence that must be sufficient . . . not each individual piece"). Accordingly, the government presented sufficient evidence at trial to support Thomas's conviction of aiding and abetting bank robbery. Appellate counsel's omission of this issue on appeal, therefore, does not constitute ineffective assistance of counsel.

2.      **Sufficiency of Evidence at Trial to Convict Thomas of Conspiracy to Commit Bank Robbery**

In his third claim in support of his Motion, Thomas argues that appellate counsel was "constitutionally ineffective for failing to raise on direct appeal the fact that evidence was insufficient to support Thomas's conviction for conspiracy to commit bank robbery." (Doc. 258 at 22.) To establish the existence of a conspiracy under 18 U.S.C. § 371, the government must demonstrate the following elements: 1) that the defendant and at least one other person agreed to commit the crime charged in the indictment; 2) that the defendant knew at least the essential objectives of the conspiracy; 3) that the defendant knowingly and voluntarily became part of the conspiracy; and 4) that the alleged co-conspirators during the conspiracy committed at least one of the overt acts described in the indictment. *See United States v. Brown*, 996 F.2d 1049, 1056 (10th Cir. 1993).

15

Because it is undisputed that the bank robbery was committed by a co-conspirator, I will only address the first three elements of the conspiracy analysis.

At trial, the government presented sufficient evidence from which a jury could reasonably infer that Thomas entered into an agreement with Mohammed and Frazier to commit bank robbery. "An agreement exists among the parties to a conspiracy when there is 'a meeting of the minds in the common design, purpose, or object[] of the conspiracy.'" *Brown*, 996 F.2d at 1056; *see also United States v. Carter*, 130 F.3d 1432, 1441 (10th Cir. 1997) ("It is permissible for a jury to infer an agreement constituting a conspiracy 'from the acts of the parties and other circumstantial evidence indicating concert of action for the accomplishment of a common purpose.'"); *Weidner*, 437 F.3d at 1033 (stating that because "secrecy and concealment are often necessary to a successful conspiracy . . . direct evidence of the crime is frequently difficult to obtain."). From the evidence presented at trial, a jury could reasonably infer that Thomas met with Mohammed and Frazier less than an hour before the bank robbery. Immediately following the robbery, the two men again joined Thomas in his apartment. From this evidence, combined with Thomas's use of the Escape to drive Mohammed, Frazier, and Summers from Thomas's apartment shortly after Mohammed and Frazier robbed the bank and abandoned the stolen Acura, a reasonable jury could infer that Thomas had entered an agreement to commit bank robbery. *See Carter*, 130 F.3d at 1439-40 (concluding that a jury could infer that an agreement existed where the defendant traveled with a large amount of unusually pure cocaine, the defendant paged the co-defendant after arriving at the bus station, and the co-defendant did not return the page but instead headed directly for the bus station to meet the defendant); *Brown*, 996 F.2d at 1057 (a jury could infer that the defendant was a party to the agreement where the defendant removed stolen liquor from a co-conspirator's truck and later arranged to have the same

16

liquor removed from the property where it had been stored). Moreover, Thomas's surprised reaction to Detective Real's presence in the parking lot, Thomas's driving behavior, and the discovery of over $5,000 in Thomas's pockets provide additional evidence from which a reasonable jury could infer that Thomas had entered into an agreement with Mohammed and Frazier to commit bank robbery. *Cf. United States v. Willis*, 102 F.3d 1078, 1083 (10th Cir. 1996) ("Our case law generally supports treating escape as part of the overall conspiracy to commit bank robbery.").

Similarly, the government presented sufficient evidence from which a reasonable jury could infer that Thomas had knowledge of the conspiracy to commit bank robbery. Thomas rented the Escape three days prior to the bank robbery. From the evidence presented at trial, a reasonable jury could infer that Thomas met with Mohammed and Frazier immediately before and after the bank robbery. Objects connected with the bank robbery were found in Thomas's apartment, in the Escape, and on Thomas's person. From Thomas's proximity to these bank-related objects a jury could reasonably infer that Thomas had knowledge of the conspiracy to commit bank robbery.

The evidence was also sufficient for a reasonable jury to infer that Thomas willfully participated in the conspiracy to commit bank robbery. "A defendant acts willfully if he is aware of the illicit nature of his conduct." *Brown*, 996 F.2d at 1057 (10th Cir. 1993). Specifically, Thomas's behavior while driving supports the inference that Thomas was a willful participant in the conspiracy to commit bank robbery. *See id.* (concluding that the jury could have reasonably inferred that the defendant was aware of the illicit nature of his actions where the defendant arranged for the storage of stolen liquor and made several surreptitious references to it). Thomas's surprised reaction to Officer Real while leaving the Pinnacle View apartments, the U-Turn he made while driving and his speed substantially in excess of the speed limit, and the cash found in his pockets provide facts from

17

which a jury could infer Thomas's willful participation in the conspiracy. Moreover, Mohammed and Frazier's action of returning to Thomas's apartment immediately after robbing the bank could reasonably suggest Thomas's willful participation in the conspiracy to commit bank robbery. Accordingly, the government presented sufficient evidence to support Thomas's conviction for conspiracy to commit bank robbery. Appellate counsel's decision to omit this issue on direct appeal, therefore, did not constitute ineffective assistance of counsel.

**RECOMMENDATION**

I recommend that Thomas's Motion to Vacate, Set Aside or Correct Sentence under 18 U.S.C. § 2255 be denied.

---

**THE PARTIES ARE NOTIFIED THAT WITHIN 10 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636 (b)(1). **A party must file any objections with the Clerk of the District Court within the ten-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

---

William P. Lynch

WILLIAM P. LYNCH
UNITED STATES MAGISTRATE JUDGE